IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENNETH E. WOOD, JR.,                  )
                                       )
              Plaintiff,               )
                                       )
       v.                              ) Civ. No. 14-476-SLR
                                       )
SHIFT SERGEANT RUSSELL, et al.,        )
                                       )
              Defendants.              )

_____

Kenneth E. Wood, Jr. James T. Vaughn Correctional Center, Smyrna, Delaware.  Pro se Plaintiff.

Kenisha LaShelle Ringgold, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendants Sergeant Russell, Lieutenant Flint, Deputy Warden Raymond, and Lieutenant Roberts.

Daniel A. Griffith and Scott G. Wilcox, Esquires, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware.  Counsel for Defendants Correct Care Solutions LLC, Jill Moser, Dr. Dale Rogers, and Dr. Lawrence McDonald.

_____

**MEMORANDUM OPINION**

Dated:  June 8 , 2017
Wilmington, Delaware

ROBINSON, Senior District Judge

## I. INTRODUCTION

Plaintiff Kenneth E. Wood Jr. ("plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, proceeds pro se and has been granted leave to proceed in forma pauperis. He filed this lawsuit in April 2014 pursuant to 42 U.S.C. § 1983 and Title II of the American with Disabilities Act, 42 U.S.C. § 12132.[1] (D.I. 3, 19, 66) Presently before the court are defendants' motions for summary judgment and plaintiff's opposition thereto. (D.I. 111, 117) The court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND

On March 19, 2008, plaintiff was convicted of two counts of rape in the third degree. (D.I. 66 at ¶ 12) As a condition of his sentence, plaintiff was to have no contact with his victim or the victim's family and no contact with anyone under the age of 18. (Id. at ¶ 13) In May 2012, plaintiff began a level four work-release sentence at Morris Community Correction Center ("MCCC") in Dover, Delaware. (Id. at ¶ 14) In late June 2012, plaintiff's victim's uncle was moved to the tier where plaintiff was housed. (Id. at ¶15) According to plaintiff, he advised defendant Sgt. Russell ("Russell") of the no contact order and, when he explained that the victim's uncle was now housed on his tier, she told him, "don't worry about it, it'll be alright," and the two remained housed on the same tier. (D.I. 121 at ¶ 4) According to Russell, she has no recollection of plaintiff ever informing her of the no contact order or that plaintiff was housed on the same tier

---

[1]The amended complaint (D.I. 66) is the operative pleading. Several defendants have been dismissed during the pendency of this action either by the court or by plaintiff through his amended complaints. (See D.I. 8, 19, 23)

as a relative of his victim. (D.I. 115) According to deputy warden Kent Raymond ("Raymond"),[2] neither plaintiff nor any member of the victim's family would have been assigned to the same housing tier had the staff known. (D.I. 114) According to Raymond, a search of plaintiff's institutional records (including contact notes) contained no evidence that plaintiff requested a change in his housing assignment during the entire time he was housed at the MCCC. (*Id.*) Also, according to Raymond, there is no evidence that plaintiff informed anyone that he and his victim's family member were housed on the same tier. (*Id.*)

On July 8, 2012, plaintiff was attacked and badly beaten by two unidentified inmates who called him a "child molester" and said "this is from Brad." (D.I. 121 at ¶ 5) Plaintiff was taken to the infirmary where he lied and said his injuries were from a slip and fall incident because he "did not want to be labeled as a snitch or get into trouble." (D.I. 45 at DOC548, 585; D.I. 113 at A25; D.I. 121 at ¶ 6) Plaintiff was treated at the infirmary for abrasions, and medical staff ordered x-rays of the left foot and ankle and an orthopedic consultation. (D.I. 113 at A11-12, 25; D.I. 121, ¶ 7) Plaintiff's ankle was wrapped, he was given pain medication, provided crutches, and ordered to ice and elevate the leg, with no weight bearing. (D.I. 45 at DOC562-563; D.I. 113 at A11)

When plaintiff was taken to Kent General Hospital for x-rays, during the ride he told Officer Wall ("Wall"), the guard transporting him, that he had not slipped and fallen but that he had been attacked by an inmate. (D.I. 114 at ¶ 4; D.I. 121 at ¶ 7) Raymond

---

[2]Raymond is the deputy warden for Kent County Community Correction ("KCCC") which is comprised of the MCCC and the Central Violation of Probation Center in Smyrna, Delaware. (D.I. 114)

2

refers to one of the incident reports where plaintiff stated that "he would be OK if he was just moved to a different tier, separate from the inmate that allegedly attacked him." (D.I. 114 at ¶ 4)  Defendant officer Eugene Roberts ("Roberts") and Wall both reported that plaintiff either said that "he feared for his life and would like to be transferred to SCCC" or that he was scared to return to the building but, when plaintiff returned to MCCC, he told Roberts that he did not have a problem going on a different tier and he preferred that to leaving. (D.I. 45 at DOC713, 718)  Plaintiff told Wood that "he would be ok if he was just moved to A-tier." (*Id.* at DOC718)

According to Raymond, once plaintiff returned to the MCCC, he was housed in a holding cell for his own protection and safety while his allegations were being investigated and pending further medical evaluation. (D.I. 114 at ¶ 5)  Raymond instructed Roberts to keep plaintiff in the holding cell for plaintiff's protection.[3] (*Id.*)  The cell had a bunk, sink, toilet, and barber's chair. (D.I. 121 at ¶ 8)  According to plaintiff, the cell was not equipped for a person with a handicap of any kind. (*Id.*)  According to Raymond, if medical staff had determined that plaintiff's medical needs could not have been met in the holding cell, alternative housing would have been considered and arranged. (D.I. 114 at ¶ 5)

The x-rays revealed that plaintiff sustained fractures to his left ankle and foot. (D.I. 45 at DOC523)  Plaintiff was seen by outside orthopedic surgeon Dr. DuShuttle ("Dr. DuShuttle") on July 11, 2012, who scheduled plaintiff for surgery on July 13, 2012.

---

[3]Roberts' incident report states that Raymond suggested that plaintiff be housed in a holding cell pending the outcome of his medication and the prison's investigation. (D.I. 45 at DOC713)

3

(*Id.* at DOC543) Plaintiff remained in the holding cell for six days while awaiting a surgical repair to his left foot and ankle. (D.I. 113 at A10, 24; D.I. 121 at ¶ 8)

Plaintiff underwent surgery on July 13, 2013 at the Dover Surgicenter. (D.I. 45 at DOC484, 544; D.I. 113 at A23) He returned to the VCC infirmary for post-surgery care and remained there from July 13, 2012 to July 20, 2012. (D.I. 45 at DOC393, 477-482, 532, 558-561, 578-584; D.I. 113 at A13, 18-19, 21-25) During that time, he received physical therapy. (*Id.*) Upon release from the VCC infirmary, plaintiff was transferred to Sussex Correctional Institution ("SCI") in Georgetown, Delaware, and then to the Sussex Community Correction Center ("SCCC") with a no weight bearing order. (D.I. 45 at DOC481; D.I. 113 at A18, 36-40) Plaintiff had a surgical follow-up appointment with Dr. DuShuttle on July 23, 2012. (D.I. 45 at DOC527) He underwent an outpatient procedure on August 20, 2012 to remove the orthopedic hardware (*i.e.*, pins). (D.I. 45 at DOC514, 517) The next day, plaintiff was seen by Dr. DuShuttle for follow-up of the procedure. (D.I. 45 at DOC513) He continued to be followed by the prison medical staff. (D.I. 45 at DOC556-557, 577-578)

According to plaintiff, when he was housed in the holding cell at MCCC awaiting surgery and at the VCC infirmary during his recovery, he asked every officer who visited his cell for grievance forms only to receive excuses why they were not brought to him or excuses for not having any. (D.I. 121, ¶¶ 8, 9) Once plaintiff was transferred to work release at the SCCC on July 20, 2012, he was able to obtain grievance forms, which he filled out and submitted, but his grievance was returned as time-barred because it was past the seven days from the date of the event plaintiff was grieving. (*Id.* at ¶ 10)

4

Plaintiff submitted sick call slips on July 21 and 26, 2012 and August 1 and 6, 2012,[4] as well as on August 23, 2012. (D.I. 45 at DOC567; D.I. 113 at A41-44)

Raymond searched MCCC records and found no record of plaintiff submitting a grievance while he was housed there during the relevant time-frame. (D.I. 114 at ¶ 6) Lt. Sean Milligan ("Milligan") searched for grievances submitted by plaintiff in connection with this lawsuit, and there is no record that plaintiff submitted a grievance while housed at the SCCC from July 20, 2012 to August 2012[5] or from August 21, 2012 to December 21, 2012. (D.I. 123)

Plaintiff states that he was required to go job seeking even though he was on crutches with pins sticking out of his foot with a no weight bearing order. (D.I. 121 at ¶ 11) According to plaintiff, he asked for medical clearance to look for a job because, had he not looked, he would have been returned to Level 5. (Id.) Once the pins were removed from his foot, plaintiff was hired by a construction company.[6] (Id. at ¶ 12) According to plaintiff, when he was seen by Dr. DuShuttle on August 27, 2012, he was

---

[4]State defendants incorrectly refer to the sick call requests as medical grievances. They are not. A sick call request, however, is a prerequisite to submitting a medical grievance. See http://www.doc.delaware.gov/downloads/policies/policy_ 11-A-11.pdf (last visited May 30, 2017), Chapter 11: Bureau of Correctional Healthcare Services, medical grievance process, DOC Policy No. A-11 at ¶ B (effective date 11/7/04, revised 4/13/09; 7/16/2010; 1/24/2011; 3/22/2013; 7/30/2013; 9/2/2015).

[5]Milligan's declaration omits the day.

[6]He was terminated from the position on December 22, 2012. (D.I. 121 at ¶ 14) When plaintiff did not return to the prison that day, he was charged with escape after conviction and a warrant issued for his arrest. (D.I. 113 at A1-9) Plaintiff was apprehended in Florida on January 8, 2013 and extradited to Delaware on March 11, 2014. (Id. at A5)

told that he needed physical therapy, but it was not provided because medical did not feel he needed it. (*Id.* at ¶ 13)

Plaintiff alleges that: (1) Russell and defendant Lieutenant Flint ("Flint") failed to protect him from harm (D.I. 66 at ¶¶ 16, 34, 41, 42); (2) Raymond ordered plaintiff's housing in a non-handicapped cell for six days and Roberts carried out the order in violation of the Eighth Amendment and the ADA (*id.* at ¶¶ 20, 21, 23, 36, 46); (3) defendant Dr. Rogers ("Dr. Rogers") failed to provide plaintiff with prompt medical treatment, failed to implement policies to provide prompt medical treatment, and failed to order or request plaintiff's transfer from the non-handicap isolation/holding cell to the infirmary in violation of the Eighth Amendment and the ADA (*id.* at ¶¶ 23, 35, 44); (4) defendants Dr. McDonald ("Dr. McDonald") and health service administrator Jill Moser ("Moser") failed to order physical therapy after the pins were removed from plaintiff's foot and ankle and then they cleared plaintiff to go job seeking while he was still on crutches and with a no weight bearing order in violation of the Eighth Amendment (*id.* at ¶¶ 28, 32); and (5) defendant Correct Care Solutions, LLC ("CCS") failed to properly train medical staff to carry out outside doctor's orders as written, allowed plaintiff to be cleared to go job seeking job despite being on crutches and not being able to bear weight on his foot or ankle, and failed to follow a doctor's order to provide plaintiff physical therapy in violation of the Eighth Amendment, the ADA, and the "RA [of] 1973"[7] (*id.* at ¶¶ 25, 28, 32, 43).

---

[7]Presumably, plaintiff refers to the Rehabilitation Act of 1973 ("Rehab Act"), as amended, 29 U.S.C. §§ 621, *et seq.*, but he does not describe how CCS violated this Rehab Act. Regardless, the claim fails as a matter of law. CCS is not a public entity subject to suit under the Rehab Act. *See Matthew v. Pennsylvania Dep't of Corr.*, 613

6

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be--or, alternatively, is--genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The

---

F. App'x 163, 169 (3d Cir. 2015) (unpublished).

judge must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252. The court must not engage in the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as these "are jury functions, not those of a judge, [when] [] ruling on a motion for summary judgment." *E.E.O.C. v. GEO Group, Inc.*, 616 F.3d 265, 278 (3d Cir. 2010) (citation omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

8

State defendants Raymond, Roberts, Russell, and Flint move for summary judgment on the grounds that: (1) plaintiff has failed to exhaust his administrative remedies as is required under the Prison Litigation Reform Act ("PLRA"); (2) plaintiff cannot show that Russell was deliberately indifferent to plaintiff's health or safety (failed to protect plaintiff from harm); and (3) the ADA claims are not cognizable against the individual defendants or defendants in their official capacities because plaintiff is not seeking injunctive or declaratory relief. Medical defendants Dr. McDonald, Dr. Roberts, Moser, and CCS move for summary judgment on the grounds that: (1) plaintiff has failed to exhaust his administrative remedies as is required under the PLRA; (2) plaintiff has failed to present evidence of constitutional violations; and (3) the claims against CCS fail as a matter of law.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants move for dismissal on the grounds that plaintiff has failed to exhaust his administrative remedies as is required under the PLRA. State defendants argue, specifically, that plaintiff did not exhaust available administrative remedies with regard to the failure to protect claim raised against Russell and, generally, that there is no evidence that plaintiff filed a grievance related to the events described in his complaint. Medical defendants argue that plaintiff failed to exhaust his administrative remedies as to the claims raised against them, including claims relating to: (1) plaintiff's confinement following the July 8, 2012 incident (July 8 through July 13, 2012); (2) the speed (or lack thereof) of the July 13, 2012 surgery; (3) clearing plaintiff to work as he

9

requested (July 20 through August 20, 2012); and (4) the failure to order physical therapy as recommended by Dr. DuShuttle on August 27, 2012.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle,* 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Defendants have the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes,* 285 F.3d 287, 295-96 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo,* 548 U.S. 81, 88 (2006). "'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard,* 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis,* 372 F.3d 218, 231 (3d Cir. 2004)). A prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the

10

exhaustion requirement of the PLRA. *Nickens v. Department of Corr.,* 277 F. App'x

148, 152 (3d Cir. 2008) (unpublished) (citing *Williams,* 482 F.3d at 639; *Spruill,* 372

F.3d at 228, 231). Perfect overlap between the grievance and a complaint is not

required by the PLRA as long as there is a shared factual basis between the two.

*Jackson v. Ivans,* 244 F. App'x 508, 513 (3d Cir. 2007) (unpublished) (citing *Woodford,*

548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance

system is given a fair opportunity to consider the grievance."). A futility exception to the

PLRA's mandatory exhaustion requirement is completely precluded. *Banks v. Roberts,*

251 F. App'x 774, 776 (3d Cir. 2007) (unpublished) (citing *Nyhuis v. Reno,* 204 F.3d 65,

71 (3d Cir. 2000)).

The exhaustion requirement is absolute, absent circumstances where no

administrative remedy is available. *See Spruill,* 372 F.3d at 227-28; *Nyhuis,* 204 F.3d

at 67. An administrative procedure is unavailable when: (1) despite what regulations or

guidance materials may promise, it operates as a simple dead end with officers unable

or consistently unwilling to provide any relief to aggrieved inmates; (2) an administrative

scheme is so opaque that it becomes incapable of use; or (3) when prison

administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation. *See Ross v. Blake,* __U.S.__, 136

S.Ct. 1850, 1859-60 (2016). If prison authorities thwart the inmate's efforts to pursue

the grievance, administrative remedies may be presumed exhausted, as no further

remedies are "available" to him. *Brown v. Croak,* 312 F.3d 109, 112-13 (3d Cir. 2002).

At KCCC, offender grievance procedures are conducted in a manner consistent with Bureau of Prisons Procedure No. 4.4, the offender grievance process. (D.I. 113 at A-27) Bureau of Community Correction administrative procedures provide a multi-tiered grievance and appeal process. (Id. at A28-35, Procedure No. 4.4 (effective date 10/23/12)) For grievances, other than medical grievances discussed below, the procedure is as follows: first, the offender must complete a form #584 grievance form and submit the completed form to the inmate grievance chairperson ("IGC") within seven days of the incident for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the resident grievance committee ("RGC") or local subject matter expert ("SME") for hearing and recommendations which are forwarded to the facility warden or appropriate bureau level SME for a decision; and third, the bureau grievance officer ("BGO") conducts the final level of review and makes a recommendation to the bureau chief whose decision is final in accepting or rejecting the BGO recommendation. (Id. at A31-33)

Medical grievances are resolved in a fashion similar to non-medical grievances. Offenders may not submit a grievance before attempting to use the sick call request process. See DOC Policy No. A-11 at ¶ B. An offender manually completes a form #585 "medical grievance" within seven calendar days of the incident (i.e., after the sick call appointment), and it is forwarded to the IGC for electronic entry. (D.I. 113 at A34; DOC Policy No. A-11 at ¶ B) Upon receipt of a medical grievance, the IGC forwards the grievance to the health services administrator ("HSA") for review.[8] (Id.) First, the

---

[8]The specific instructions and time frames are set forth in the Bureau of Correctional Healthcare Services Policy # A-11 and are not a part of the offender

site HSA or designee reviews grievances on a weekly basis and attempts to resolve concerns brought by offenders at the initial stage of the formal grievance process after review of the record, interviews, and investigation for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the medical grievance committee ("MGC") for review and it makes a determination to uphold or deny the grievance; and third, if an offender appeals, the grievance is reviewed by the BGO (who is a member of Bureau of Correctional Healthcare Services), and the BGO makes a recommendation to the bureau chief or his or her designee who then accepts or rejects the BGO's recommendation in deciding the disposition of the case. See http://www.doc.delaware. gov/downloads/policies/policy_11-A-11.pdf (last visited May 30, 2017), DOC Policy No. A-11 at ¶¶ VI.E.-G (effective date 11/7/04, revised 4/13/09; 7/16/2010; 1/24/2011; 3/22/2013; 7/30/2013; 9/2/2015).

The evidence before the court is that during the time plaintiff was housed in the MCCC holding cell awaiting surgery from July 8, 2012 through July 13, 2013, and recovering from surgery at the VCC from July 13, 2012 through July 20, 2012, he asked every officer who came to his cell for grievance forms only to be given excuses why they did not bring any or why they did not have them.[9] On July 20, 2012, while housed

___

grievance process. (See D.I. 113 at A-34)

[9]Both State defendants and medical defendants question plaintiff's declaration, provided under penalty of perjury. (D.I. 121) Medical defendants argue that "it is inconceivable that plaintiff made 39 requests for grievance forms and was denied each and every time for no apparent reason by the prison guards." (D.I. 118 at 6) Raymond finds plaintiff's statements "highly unlikely" and points to plaintiff's original complaint wherein he responded "no" when asked if he had exhausted his administrative remedies. (D.I. 3 at 2; D.I. 114 at ¶ 6) In the original complaint, plaintiff explained that he filed a grievance and then was extradited to Florida (a misstatement given the record

13

at the SCCC, plaintiff was finally able to obtain grievance forms which he filled out and submitted, but they were rejected as time-barred. Raymond conducted a search at the MCCC and found no record that plaintiff submitted a grievance while he was housed at the MCCC (*i.e.*, May 2012 through July 13, 2012). This is consistent with plaintiff's statement that he was not provided the required grievance forms while at MCCC. When Milligan searched for grievances at the SCCC, he did not find any that were submitted by plaintiff in connection with this lawsuit while he was housed there from July 20, 2012 to August 2012, and from August 21, 2012 to December 21, 2012. Milligan's statement contradicts plaintiff's statement that he submitted at least one grievance after obtaining grievance forms on July 20, 2012.

The court must construe the evidence in the light most favorable to plaintiff, the non-moving party. In doing so, plaintiff provided evidence that he was thwarted in his efforts to exhaust his administrative remedies while he was housed at the MCCC and the VCC from July 8, 2012 through July 20, 2012. Once plaintiff arrived at the SCCC on July 20, 2012, by his own admission, grievance forms were made available to him and he submitted at least one grievance. In addition, plaintiff submitted a sick call request on July 21, 2012 and thereafter, which is a prerequisite to submitting a medical grievance.

Given the above record, the court presumes that plaintiff was not provided with grievance forms before July 20, 2012. Although plaintiff did not timely submit

---

showing that he escaped from prison). (D.I. 3 at 2) Nonetheless, "[c]redibility determinations are for the factfinder and are inappropriate at the summary judgment stage." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (citing *Anderson v. Liberty Lobby*, 477 U.S. at 255).

grievances during this time period as a consequence, the court will review the merits of the claims that relate[10] to the pre-July 20, 2012 actions.

Plaintiff also raises claims for actions that occurred after July 20, 2012. As discussed, by that time grievance forms and sick call request forms were available to plaintiff. Plaintiff states that he submitted a grievance on or after July 20, 2012, and the record reflects that he submitted sick call slips as early as July 21, 2012. While plaintiff submitted sick call slips as to some of the claims he now raises, defendants could find no grievances submitted by plaintiff that relate to the claims raised in this action. Plaintiff produced no evidence to the contrary nor did he refer to any circumstance that prevented him from submitting grievances. Plaintiff failed to exhaust his administrative remedies against Dr. McDonald, Moser, and CCS with respect to his claims that he was denied physical therapy and that he was prematurely cleared to go job seeking. Thus, the claims are procedurally defaulted. *See Spruill*, 372 F.3d at 232, 228-31; *Parks v. Edinger*, 663 F. App'x 124, 126 (3d Cir. 2016) (unpublished) (prisoner's failure to exhaust his administrative remedies barred his claim challenging adequacy of medical treatment).

Therefore, the court will deny State defendants' motion for summary judgment on the grounds of failure to exhaust and will grant in part and deny in part medical defendants' motion for summary judgment on the same issue.

_____

[10]His failure to protect claims against Russell and Flint, the conditions of confinement claims against Raymond, Roberts, and Dr. Rogers while plaintiff was housed in the holding cell for six days at MCCC while awaiting surgery, and the delay in medical treatment/surgery claim against Dr. Rogers.

## B. Failure to Protect

Plaintiff raises failure to protect claims against Russell and Flint. State defendants move for summary judgment on the grounds that plaintiff cannot show that Russell was deliberately indifferent to plaintiff's health or safety and that plaintiff failed to show that he notified anyone that he was housed on the same tier as his victim's relative.

To prevail on an Eighth Amendment failure to protect claim, a plaintiff is required to show that: (1) he is incarcerated under conditions posing a substantial risk of serious harm (the objective element); and (2) prison officials acted with deliberate indifference, *i.e.*, prison officials knew of and disregarded an excessive risk to inmate health or safety (the subjective element). *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994); *see also Griffin v. DeRosa*, 153 F. App'x 851 (3d Cir. 2005) (unpublished). "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). Knowledge may be shown where the official has actual notice of the risk, *Nami v. Fauver*, 82 F.3d 63, 67-68 (3d Cir. 1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842.

16

The complaint alleges that Flint, as shift commander, failed to protect plaintiff when he did not override Russell when she failed to move plaintiff after she was notified of a potential risk of harm to plaintiff. (D.I. 66 at ¶ 42) In moving for summary judgment, State defendants rely upon Raymond's declaration that there is no evidence that plaintiff informed anyone that he and a member of his victim's family were housed on the same tier. As to Flint, plaintiff does not refute this statement. In addition, there is no evidence of record that supports the claim raised against Flint. No reasonable jury could find in favor of plaintiff with regard to the failure to protect claim against Flint and, therefore, summary judgment on his behalf is appropriate.

The outcome differs with regard to the failure to protect claim raised against Russell in light of plaintiff's sworn statement that specifically speaks to an interaction between the two. The complaint alleges that: (a) plaintiff notified Russell that the uncle of his victim was moved to plaintiff's tier; and (b) plaintiff explained the nature of his charge and that his charge caused a high chance of conflict and risk for him. Plaintiff's sworn statement explains that during the last two weeks of June 2012, he advised Russell that he and his victim's uncle were now housed on the same tier and there was a no contact order in place, only to be told by Russell not to worry about it. The record reflects that plaintiff was called a child molester, attacked by inmates, and sustained injuries shortly after that, on July 8, 2012. Conversely, Russell's sworn statement is that she has no recollection that plaintiff ever informed her of the no contact order or that plaintiff was housed on the same tier as a relative of his victim. As previously discussed, Raymond states that there is no evidence that plaintiff informed anyone that he and a member of his victim's family were housed on the same tier. Given the

parties' discrepant statements, the court finds that there remains a genuine issue of fact whether plaintiff was housed under conditions posing a substantial risk of serious harm and whether Russell knew of and disregarded an excessive risk to plaintiff's inmate health or safety. Therefore, summary judgment on her behalf is not appropriate.

Based upon the foregoing, the court will grant State defendants' motion for summary judgment on the failure to protect claim raised against Flint and will deny the motion for summary judgment on the failure to protect claim raised against Russell

### C. Combined ADA/Conditions of Confinement Claim

Plaintiff raises combined ADA/conditions of confinement claims against Raymond, Roberts, and Dr. Rogers wherein he alleges that defendants failed to house him in the infirmary pending surgery and, instead, for six days housed him in a cell that was not handicapped accessible.

The ADA claims against the foregoing defendants fail as a matter of law. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 553 n.32 (3d Cir. 2007). Individual defendants such as Raymond, Roberts, and Dr. Rogers, are not public entities within the meaning of Title II of the ADA and, therefore, are not subject to suit. See Emerson v. Thiel Coll., 296 F.3d 184, 189 (3d Cir. 2002) (individuals are not subject to liability under "Titles I or II of the ADA, which prohibit discrimination by employers and public entities respectively."). Nor is CCS, the prison contract medical service provider, a public entity subject to suit under the ADA.

18

*See Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x at 169 (private contractor who provided medical services for state prisoners pursuant to contract with state department of corrections did not qualify as "public entity" subject to suit under the ADA). Accordingly, summary judgment is appropriate as to the ADA claims raised against State defendants Raymond and Roberts and medical defendants Dr. Rogers and CCS.

Plaintiff also raises conditions of confinement claims against Raymond, Roberts, and Dr. Rogers based upon the six days he spent in the MCCC holding cell. In plaintiff's declaration, he states that the cell in question was equipped with a bunk, sink, toilet, and barber's chair, but it was not equipped for a person with a handicap of any kind. Raymond states that if the medical staff had determined that plaintiff's medical needs could not have been met during that time, alternative housing would have been considered and arranged.

A condition of confinement violates the Eighth Amendment only if it is so reprehensible as to be deemed inhumane under contemporary standards or such that it deprives an inmate of minimal civilized measure of the necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). When an Eighth Amendment claim is brought against a prison official it must meet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Deliberate indifference is a subjective standard in that the prison official must actually have known or been aware

of the excessive risk to inmate safety. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

No reasonable jury could find in favor of plaintiff on the conditions of confinement claim. The evidence of record indicates that the cell where plaintiff was housed did not deprive plaintiff of the minimal civilized measure of the necessities of life. Moreover, defendants were aware of plaintiff's medical condition and determined his needs were being met during the six days in question. Plaintiff provided no evidence to rebut Raymond's statement that plaintiff would have been moved had medical determined the housing assignment was not appropriate for plaintiff's medical treatment while awaiting surgery. Therefore, the court will grant defendants' motions for summary judgment on the Eighth Amendment conditions of confinement claim.

### D. Medical Needs

Medical defendants argue that plaintiff has failed to present evidence of constitutional violations. The court turns to the merits of plaintiff's claim that: (1) Dr. Rogers failed to provide prompt medical treatment; (2) Dr. Rogers failed to implement policies to provide prompt medical treatment; and (3) CCS failed to properly train medical staff to carry out outside physician's orders as written. The court does not address the remaining medical needs claims due to plaintiff's failure to exhaust his administrative remedies, as discussed above.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an

inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05; *see also Monmouth Cnty. Corr. v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987) (deliberate indifference can be shown when medical treatment is delayed for non-medical reasons).

However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill*, 372 F.3d at 235 (citations omitted).

The record does not demonstrate that Dr. Rogers was deliberately indifferent to plaintiff's medical needs. Instead, the record reflects that after plaintiff was assaulted, he received prompt treatment at all correctional institutions where he was housed, as well as outside medical care in the form of diagnostic testing, surgery, and follow-up care. Based upon the voluminous medical evidence of record, no reasonable jury could find that Dr. Rogers was deliberately indifferent to plaintiff's medical needs or that he failed to implement policies to provide prompt medical treatment.

In addition, because the court concludes that individual medical defendants did not violate plaintiff's constitutional rights under the Eighth Amendment, CCS cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating plaintiff's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs, where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights). Accordingly, the court will grant medical defendants' motion for summary judgment.

**V. CONCLUSION**

For the above reasons, the court will: (1) grant in part and deny in part State defendants' motion for summary judgment (D.I. 111); and (2) grant medical defendants' motion for summary judgment (D.I. 117). The only claim that remains is the failure to protect claim raised against Sergeant Russell.

A separate order shall issue.